**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF RHODE ISLAND**

---

In re:   Barry Alofsin,                                              BK No: 10-14654
         Debtor                                                      Chapter 7

---

# DECISION AND ORDER
# ON DEBTOR'S MOTION TO REOPEN

Debtor Barry Alofsin moves to reopen his chapter 7 bankruptcy case to amend Schedule F for the purpose of adding Denys Cousens as a pre-petition, unsecured creditor to obtain a discharge of Mr. Cousens' debt by including him as a creditor in his bankruptcy case.[1] The case was filed in 2010, fully administered with the discharge entered, and closed in 2011. Mr. Cousens objects.[2]

After holding an evidentiary hearing, the Court directed the parties to file their respective post-trial memos and, upon their filing, took the matter under advisement on September 4, 2015. This decision constitutes my findings of fact and conclusions of law. After careful review of the testimony, exhibits, and post-trial memos, I conclude that Mr. Alofsin is not entitled to reopen his case to add Mr. Cousens to his schedule of unsecured creditors to discharge this debt.

---

[1] Mr. Alofsin also moved to reopen the case to add American Express Centurion Bank as a creditor on Schedule F. No objection having been filed by this creditor after proper service, the Court ordered the case reopened for the purpose of including American Express Centurion Bank on Schedule F. *See* Doc. #37. This decision is rendered only as to Mr. Alofsin's motion regarding Mr. Cousens.

[2] *See* Motion to Reopen Case (Doc. #15) ("Motion"), Memorandum in Support of Debtor's Motion to Reopen Case (Doc. #21) ("Debtor's Memo"), and Debtor's Post-trial Brief in Support of Motion to Reopen Case (Doc. #53) ("Debtor's Post-trial Memo"); Objection of Denys Cousens to the Debtor's Motion to Re-Open the Case (Doc. #18) ("Cousens' Objection"), Affidavit of Denys Cousens in Support of his Objection to the Debtor's Motion to Re-Open the Case (Doc. #26) ("Cousens' Affidavit"), and Post-Trial Memorandum of Law in Support of the Objection of Denys Cousens to the Debtor's Motion to Re-Open the Case to Add Denys Cousens As a Creditor to the Debtor's Bankruptcy Schedules (Doc. #52) ("Cousens' Post-Trial Memo").

I.   Jurisdiction

The Court has jurisdiction in this matter under 28 U.S.C. §§ 157(a) and 1334(a), and DRI LR Gen 109(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

II.  Law on Reopening a Case

Bankruptcy Code § 350(b) provides: "A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[3] This Court, in *In re McGuire*, 299 B.R. 53 (Bankr. D.R.I. 2003), addressed this issue of adding a creditor omitted from the bankruptcy schedules after the case has been closed. The Court referred to the standard for determining whether to permit reopening a case under this Code section as articulated by the United States District Court for the District of Rhode Island in *In re Gray*, 60 B.R. 428 (D.R.I. 1986):

> It is settled beyond cavil that reopening rests within the sound discretion of the bankruptcy court and depends upon the facts of each case… In exercising this discretion anent "omitted creditor" cases (like the one at bar), bankruptcy courts have looked in particular to whether the debtor's failure to include the omitted creditor on the original schedule was part of a scheme of fraud or intentional design…and/or whether the creditor will be unfairly prejudiced if reopening is permitted… Reopening is a congiary to be bestowed upon the deserving, not a matter of right. *Id.* at 429 (citations omitted).

*McGuire*, 299 B.R. at 55. "[T]he debtor is held to a standard of reasonable diligence in ascertaining and listing all creditors" and "a mistaken belief [does] not relieve the debtor of his duty to file accurate schedules." *In re Gray*, 57 B.R. 927, 930-31 (Bankr. D.R.I. 1986). As the

---

[3] Unless otherwise indicated, the terms "Bankruptcy Code," "chapter," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C.§§ 101, *et seq.*, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub L. No. 109-8, 119 Stat. 37 ("BAPCPA").

moving party, Mr. Alofsin bears the burden of demonstrating sufficient cause to reopen his case. *See In re Dalezios*, 507 B.R. 54, 58-59 (Bankr. D. Mass. 2014) (*citing Colonial Sur. Co. v. Weizman*, 564 F.3d 526, 532 (1st Cir. 2009) (also stating that a debtor can move to reopen for the purpose of listing a debt "where the failure to give notice was innocent and can be shown to have caused no harm")). In short, for Mr. Alofsin to prevail on his Motion he bears the burden of demonstrating: (1) that his failure to include Mr. Cousens on Schedule F[4] was not part of a scheme of fraud or intentional design (in other words, that the failure was innocent); (2) that Mr. Cousens will not be unfairly prejudiced if reopening is permitted (in other words, that he was not harmed by Mr. Alofsin's failure to list him as a creditor on Schedule F); and (3) that he exercised reasonable diligence in ascertaining and listing all of his creditors on Schedule F. I conclude that Mr. Alofsin has failed to satisfy these requirements.

III.    Findings of Fact and Conclusions of Law

Based on the testimony given by the two witnesses at the hearing, Mr. Alofsin and Mr. Cousens, and the exhibits admitted into evidence, I find that: (1) Mr. Alofsin not only failed to exercise reasonable diligence in completing his schedules to include all of his creditors, (2) he intentionally omitted the debt he owed to Mr. Cousens from his bankruptcy schedules, and (3) Mr. Cousens was harmed by such intentional omission and will be unfairly prejudiced if the case is reopened to permit Mr. Alofsin to include him as a creditor and discharge the debt he is owed.

---

[4] Schedule F, entitled "Creditors Holding Unsecured Nonpriority Claims," is where a debtor lists all of his creditors who do not hold security or a priority under the Bankruptcy Code for their claims.

Mr. Alofsin filed his Chapter 7 petition on November 4, 2010, and he did not list Mr. Cousens as a creditor on Schedule F or on any other schedule. *See* Doc. #1.[5] The chapter 7 trustee filed his report of no distribution on December 30, 2010, an order was entered discharging Mr. Alofsin on February 8, 2011, and the case was closed on February 17, 2011. More than four years later, after Mr. Cousens filed a state court action against Mr. Alofsin to collect his debt, Mr. Alofsin filed the Motion on March 27, 2015, and Mr. Cousens objected. The Court held an evidentiary hearing on June 4, 2015.[6]

At trial Mr. Alofsin testified that he was aware there was a debt owed to Mr. Cousens and he knew the amount of that debt when he was preparing his bankruptcy petition and schedules. (Tr. p.8, line 22 – p.9, line 3). He professed that the debt was not included on his bankruptcy schedules and that he did not at that time have or attempt to look for a copy of the promissory note evidencing the debt to Mr. Cousens, which he drafted, because he recalled writing it as a corporate debt. (Tr. p.9, lines 4-12; p.39, line 22 – p.40, line 2). By "corporate debt," Mr. Alofsin meant that he believed the debt was owed to Mr. Cousens by Competition Imports, Inc., a used car dealership owned by Mr. Alofsin's father. Mr. Alofsin, who had no ownership interest in Competition Imports, testified that he worked as an independent contractor for the dealership, handling both sales and administrative matters. (Tr. p.9, lines 23-24; p.13, line 1 – p.14, line 1; p.33, lines 1-6; p.61, lines 5-12). Mr. Alofsin further explained that he believed this debt to be a corporate obligation because several months earlier—in 2006—he had prepared a separate

---

[5] The Court takes judicial notice of the bankruptcy docket in this case. *See In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

[6] An audio file of the hearing is available at Doc. #36, and a transcript of the hearing is available at Doc. #51. The transcript will be cited as Tr. p.__, line __.

4

promissory note memorializing a loan from Mr. Cousens to Competition Imports, which his father signed as president of the company. (Tr. p.11, lines 20-23; p.17, line 14 – p.18, line 3).

In fact, as Mr. Alofsin concedes, the promissory note at issue, which the parties executed in 2007 and Mr. Alosfin personally drafted, memorializes *his* debt to Mr. Cousens; it identifies him as the borrower and he signed it in his individual capacity and not on behalf of Competition Imports. (Tr. p.11, lines 3-7; p.15, line 24 – p.16, line 6). Mr. Alosfin further admits that after he signed the promissory note, Mr. Cousens delivered a $25,000 check directly to him payable to him personally, not Competition Imports. (Tr. p.16, lines 12-21). Finally, he testified that the purpose of the loan was to buy and sell cars for the dealership. (Tr. p.12, lines 4-9). But he also testified that he would use his own money to buy vehicles to sell through Competition Imports on which he would be paid a commission. (Tr. p.33, lines 4-6, p.33, line 25 – p.34, line 8).

Mr. Alofsin relies heavily on two factors to support his assertion that the failure to list Mr. Cousens on Schedule F was an honest mistake made through excusable neglect. First, according to his testimony, he often made payments to Mr. Cousens from a Competition Imports checking account he controlled, (Tr. p.9, lines 13-19), arguing that this demonstrates the truthfulness of his erroneous belief that the debt was a corporate obligation. Mr. Alofsin ignores the fact, however, that he also admits he made payments to Mr. Cousens by other means and from other sources. For instance, sometimes he made cash payments, (Tr. p.9, lines 13-16; p.10, lines 23-24; p.38, lines 8-14), and, according to Mr. Cousens' unrebutted testimony, at times he made payments on the debt from a checking account held by 114 West Main Road, Inc., the corporation that owned the real estate on which Competition Imports operated. (Tr. p.83, line 11 – p.84, line 24). I also find it highly persuasive that when he did not make a required payment,

5

Mr. Alofsin would often offer excuses to Mr. Cousens based upon his personal financial situation, not that of Competition Imports. For example, he would tell Mr. Cousens that he had to pay his home mortgage and did not have enough funds to also make the loan payment to Mr. Cousens. (Tr. p.47, lines 11-22; p.60, lines 14-17). It is quite apparent that Mr. Alofsin believed it appropriate for Competition Imports to make payments on the loan because he had used the loan proceeds to purchase vehicles sold through the dealership. But I do not find credible his testimony that he thought the debt was one owed directly by Competition Imports. His excuses and use of funds other than those of Competition Imports to make payments on the loan manifests his acknowledgement that the debt was his personal obligation and not a corporate one.

The second factor Mr. Alofsin presses is that he continued making payments on Mr. Cousens' debt after his bankruptcy discharge using corporate funds, arguing that doing so also demonstrates his understanding of the debt as a corporate obligation. (Tr. p.36, line 22 – p.37, line 1; Debtor's Post-trial Memo at 7). I do not agree and the totality of the evidence supports a different conclusion. Mr. Alofsin had significant financial motivation to continue to make payments on the loan and intentionally omit Mr. Cousens from his schedules of creditors. In doing so he avoided Mr. Cousens receiving notice of his bankruptcy and the discharge of the debt so Mr. Cousens would continue to do business with him, business from which Mr. Alofsin personally profited.

In contrast, I find Mr. Cousens a credible witness, and his testimony supports my determination that Mr. Alofsin knew the obligation owed to Mr. Cousens was his personal debt, that he intentionally did not list Mr. Cousens on Schedule F, and that Mr. Cousens suffered harm

by continuing to do business with him. According to his unrefuted testimony, Mr. Cousens has known Mr. Alofsin and his family since Mr. Alofsin was a child, going back at least 40 years. (Tr. p.66, lines 1-22; Debtor's Post-Trial Memo at 2; Cousens' Post-Trial Memo at 1). He testified that he considered himself a friend of the Alofsin family. (Tr. p.67, lines 1-3). In 2006, Mr. Cousens loaned $25,000 to Competition Imports, evidenced by a promissory note Mr. Alofsin's father executed in his capacity as president of Competition Imports. (Tr. p.67, lines 4-19). Then in 2007, Mr. Alofsin requested a loan in the same amount as he had provided to the dealership and Mr. Cousens obliged. (Tr. p.69, line 17 – p.70, line 18). Additionally, Mr. Cousens engaged in and continued to engage in other business with both Competition Imports and Mr. Alofsin prior to and well after the close of Mr. Alofsin's bankruptcy case, including buying and selling vehicles and assisting in the shop. (Tr. p.78, line 16 – p.79, line 2). Mr. Cousens testified unequivocally that if Mr. Alofsin's debt to him had been discharged in the bankruptcy case, he would not have continued to do business with Mr. Alofsin. (Tr. p.80, lines 9-23). Given the long-standing personal and business relationship that Mr. Alofsin and his family had with Mr. Cousens, I find it more credible that Mr. Alofsin knew the loan was a personal debt and intentionally did not list Mr. Cousens as a creditor to avoid jeopardizing this relationship.

Turning to the element of harm sustained by this intentional omission, I find particularly significant a transaction that took place several years after the close of the bankruptcy case. Mr. Cousens testified that his 1970 Jaguar had been placed for sale at Competition Imports for many years when, in 2014, he had a conversation with Mr. Alofsin in which they reached the following agreement: if Mr. Alofsin sold the vehicle for more than $12,000, the original price Mr. Cousens had paid for it, then Mr. Cousens would be paid his $12,000 investment and they would split any

7

profit above that sum. (Tr. p.79, lines 3-17). At the hearing, Mr. Alofsin conceded that this may have been their agreement, although he was not certain. (Tr. p. 43, lines 3-10) ("I recall the terms to be one of two things. It was either I keep everything over twelve thousand dollars or we split everything over twelve thousand dollars."). Once again, I deem Mr. Cousens' definitive testimony more credible: he was to be paid $12,000 and receive one-half of any sale proceeds above this base amount.

The parties agree that Mr. Alofsin did not hold up his end of the bargain. Mr. Cousens testified that he was told the vehicle was sold for $20,000 and he was given a check for only $10,000 of the sale proceeds. (Tr. p.79, line 18 – p.80, line 8). This is a clear breach of the parties' agreement and, if $20,000 were indeed the actual sales price, then Mr. Cousens would have been harmed in the amount of $6,000. But Mr. Cousens was not told the whole story. In fact, Mr. Alofsin admitted that the buyer of the vehicle paid a total of either $29,000 or $30,000 for the Jaguar, that he told Mr. Cousens it sold for $20,000, and that he retained $9,000 or $10,000 of the sale proceeds as his commission but did not reveal this to Mr. Cousens. (Tr. p.44, line 10 – p.47, line 10).[7] If we do the calculations based on the parties' agreement, Mr. Cousens should have received payment from the $29,000 or $30,000 sale proceeds of either $20,500 or $21,000 (the total of the $12,000 he paid for the vehicle plus one-half of the funds over this base

---

[7] Mr. Alofsin attempted to characterize the sale price as $20,000 plus a separate commission of $9,000 or $10,000 paid to him directly by the buyer. I find his efforts disingenuous. If this is true, then the transaction was obviously structured in a manner to avoid a sales tax payable by the buyer to the State of Rhode Island assessed upon the full purchase price, and an illegal transaction in which the Mr. Alofsin was knowingly complicit. Moreover, at one point, Mr. Alosfin testified that the vehicle purchaser either "gave a check for [$20,000], and gave cash of [$9,000]. Or a check for [$21,000] and cash for nine." (Tr. p.46, lines 17-19). This discrepancy only discredits Mr. Alosfin's testimony further.

8

sum, equal to $8,500 or $9,000). According to the testimony, instead, Mr. Cousens received $10,000, Competition Imports received $10,000, and Mr. Alofsin received $9,000 or $10,000. So in actuality, Mr. Cousens was shortchanged to his detriment by $10,500 or $11,000 as a result of engaging in this transaction, which he testified credibly he would not have done if he had received notice of the bankruptcy and the discharge of Mr. Alofsin's debt owed to him. But he did not know this, so he continued to do business with Mr. Alofsin and still has not received full payment of his debt.

IV.  Conclusion

Returning to the elements Mr. Alofsin has the burden of proof to establish in order to reopen his case under § 350(b) to add Mr. Cousens as a creditor and discharge his debt, my findings of fact and conclusions of law can be succinctly summarized as follows.

1. Was Mr. Alofsin's failure to list Mr. Cousens as a creditor on Schedule F an innocent mistake? No. I do not find credible Mr. Alofsin's testimony that his failure to include Mr. Cousens on Schedule F was inadvertent and that he believed the debt to Mr. Cousens to be a corporate debt. Mr. Alofsin, who is not an unsophisticated individual, personally prepared the promissory note and personally received the loan proceeds. At times he paid Mr. Cousens in cash and he also proffered excuses for his non-payment based upon his personal expenses that he determined had priority over his obligations to Mr. Cousens. I find more credible that his motivation for this intentional omission was his long-standing personal and financially beneficial relationship with Mr. Cousens that he did not want to jeopardize, which would have occurred according to Mr. Cousens' credible testimony.

2. Has Mr. Alofsin demonstrated that Mr. Cousens will not be unfairly prejudiced if reopening the case is permitted to add him as a creditor and discharge his debt? No. The evidence establishes that Mr. Cousens was in fact harmed by Mr. Alofsin's failure to include him on Schedule F through his continued business relationship with Mr. Alofsin, which he would not have continued had he known about Mr. Alofsin's bankruptcy filing and the discharge of his debt. Mr. Cousens would only be further prejudiced by the reopening of this case and the discharge of his debt because, in addition to the economic loss he has already sustained by engaging in post-petition business with Mr. Alofsin, he has expended funds in pursuing his state law remedies to collect on this unpaid debt and in challenging Mr. Alofsin's efforts to obtain a discharge of the debt four years after the bankruptcy case was closed.

3. Has Mr. Alofsin demonstrated that he exercised reasonable diligence in ascertaining and listing all of his creditors on his original Schedule F? No. As stated, I do not find credible Mr. Alofsin's testimony that he believed Mr. Cousens' debt to be a corporate debt of Competition Imports. Even assuming *arguendo* that he was under this impression because of his faulty memory, he did not exercise the "reasonable diligence in ascertaining and listing all creditors," as required. It would have been the simplest of due diligence to review a copy of the promissory note, the note *he* originally drafted, when preparing his bankruptcy schedules. While I have found just the opposite—the omission to be deliberate—based on this lack of due diligence, I would also find that Mr. Alofsin has not met his burden to demonstrate that he exercised the requisite reasonable diligence in ascertaining and listing all of his creditors on his filed Schedule F.

      The credible testimony at the hearing and the exhibits in evidence compel the conclusion that Mr. Alofsin is not entitled to reopen this case to add Mr. Cousens as an unsecured creditor and receive a discharge of his debt owed to him. The Motion as it relates to Mr. Cousens is DENIED.

Date:  October 13, 2015				By the Court,

						_Diane Finkle_
						Diane Finkle
						U.S. Bankruptcy Judge